IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

THOMAS L. CREEL                                                              PLAINTIFF

VS.                                                      CIVIL ACTION NO. 2:04CV238KS-MTP

UNITED STATES OF AMERICA,
LLOYD F. MERCER, M.D.,
FRED W. RUSHTON, JR. M.D., and
UNIVERSITY SURGERY
ASSOCIATES, PLLC                                                            DEFENDANTS

### MEMORANDUM OPINION AND ORDER

This cause is before the court on defendant United States of America's motion to dismiss, defendant Lloyd F. Mercer, M.D.'s motion to dismiss and second and alternative motion to dismiss, and defendant Fred W. Rushton, Jr. M.D.'s motion for summary judgment. From its review of all matters made a part of the record of this case as well as applicable law, and thus being fully advised in the premises, the court FINDS that the United States' motion to dismiss should be denied, that Defendant Mercer's motion to dismiss should be granted, that Defendant Mercer's second and alternative motion to dismiss should be overruled as moot and that Defendant Rushton's motion for summary judgment should be granted. The court specifically finds as follows:

### FACTUAL BACKGROUND

This lawsuit arises from medical treatment plaintiff Thomas Creel received in October and November of 2002 at G.V. Montgomery V.A. Medical Center in Jackson, Mississippi ("VAMC"), which is owned and operated by defendant the United States of America. During the

1

course of medical evaluations at VAMC in October 2002, plaintiff received advice from his orthopedic surgeon, defendant Lloyd Mercer, M.D., that he should have his left knee surgically replaced. At this time, Dr. Mercer was a full-time member of the orthopedic staff at the VAMC. Dr. Mercer's contract with VAMC (the "Mercer Contract") states that "[t]he contractor shall provide Orthopedic Surgeon Services at [VAMC] in accordance with the requirements of the contract."[1] The Mercer Contract provides that Dr. Mercer is to provide staff coverage of orthopedic surgery clinics and attending staff responsibility for in-patient orthopedic care and supervision of orthopedic residents."[2] In addition, the Mercer Contract provides that "[t]he services to be performed by the contractor will be performed in accordance with VA policies and procedures and regulations of the medical staff by-laws[3] of the VA facility," as well as the VHA Handbook, and will be performed "under the direction of the Chief of Staff and the Chief, Surgical Service."

The Mercer Contract also provides that "[p]ersonnel assigned by the Contractor to perform the services covered by this contract shall be licensed in a State ... the qualifications of such personnel shall also be subject to review by the VA Chief of Staff and approval by the VA

---

[1] The original term of the Mercer Contract was August 15, 2002 through September 30, 2002 with one option year, October 1, 2002 through September 30, 2003. The contract has been further extended at least until the date of Dr. Mercer's motion to dismiss, in May 2005.

[2] These are residents in the Orthopedic Surgery and Rehabilitation Department at University of Mississippi Medical Center ("UMMC") (of which VAMC is the teaching hospital). UMMC is owned and operated by the state of Mississippi. Dr. Mercer avers that he began supervising residents on or about August 15, 2002, but that he was not formally appointed as a non-salaried clinical instructor at UMMC until April, 2003, effective May 1, 2003.

[3] Dr. Mercer testified in his deposition that he was not provided with a copy of, nor required to become familiar with, the by-laws, as a condition of his employment under the VA contract.

Facility Director," and that "[o]ther necessary personnel for the operation of the services contracted for at the VA will be provided by the VA." The Mercer Contract also provides that "[t]he contractor shall be responsible for protecting the personnel furnishing services under this contract" and requires the contractor to provide for its personnel's workers' compensation, no less than one million dollars in professional liability insurance,[4] health examinations, income tax withholding and social security payments. The Mercer Contract expressly provides that "the parties agree that the contractor, its employees, agents and subcontractors shall not be considered VA employees for any purpose." Finally, the Mercer Contract provides:

> It is expressly agreed and understood that this is a nonpersonal services contract...under which the professional services rendered by the Contractor or its health care providers are rendered in its capacity as an independent contractor. The Government may evaluate the quality of professional and administrative services provided but retains no control over professional aspects of the services rendered, including by example, the Contractor's or its health care providers' professional medical judgment, diagnosis, or specific medical treatments. The contractor and its health care providers shall be liable for their liability-producing acts or omissions.

The original Mercer Contract provides an estimated price of $18,768.00 (calculated at $1104.00 per day, seventeen days per month), and provides an estimated price for option year 1 of $264,960.00 (calculated at $22,080 per month, twelve months per year). In accordance with the Mercer Contract, Dr. Mercer submitted an invoice each month for payment.[5] The United

---

[4] Pursuant to the Contract, Dr. Mercer obtained professional liability insurance from the Medical Assurance Company of Mississippi.

[5] Monthly invoices in the following amounts were submitted and accepted for payment: on September 10 and October 2, 2002, in the amount of $9,384; for the remainder of 2002 and through November 17, 2003, in the amount of $22,080; on December 19, 2003, in the amount of

States paid Dr. Mercer the exact amount of his invoice in full and did not make any deductions for any withholdings such as federal taxes, state taxes, Medicare or Medicaid, federal withholding or any other withholding.

The Mercer Contract provides that Dr. Mercer's work hours are 8:00 a.m. to 4:30 p.m., Monday through Friday, and that Dr. Mercer was not required, except upon emergency, to furnish services during off-duty hours. Dr. Mercer was paid additional remuneration for time he worked in excess of the 8:00 a.m to 4:30 p.m., Monday through Friday, schedule. Dr. Mercer did not accrue any vacation time and he was paid less during the time he took vacation. During the time period at issue, Dr. Mercer did not treat patients at any facility other than the VAMC, although the Mercer Contract did not explicitly prevent him from doing so.

Dr. Mercer performed pre-operative surgical evaluations on plaintiff on October 18 and 21, 2002, and the knee replacement surgery was performed on November 4, 2002. Dr. Mercer did not discuss the type of surgery he was going to perform on plaintiff with his supervisor, the Chief of Surgery, nor did the Chief of Surgery come into the surgery suit while Dr. Mercer was operating on plaintiff. Dr. Mercer made a choice of the type of procedure he was going to perform on plaintiff based solely on his professional opinion.

The morning after the surgery, Dr. Mercer was alerted to the fact that the plaintiff's leg did not have a pulse and was losing color. Dr. Mercer concluded that an arteriogram was likely necessary to determine the cause and extent of the damage. According to Dr. Mercer, at this time

---

$11,240.76; on January 8, 2004, in the amount of $16,058.20; on February 5, 2004 and through October 7, 2004, in the amount of $25,813.33; on November 2, 2004, in the amount of $28,033.33; on December 3, 2004, in the amount of $27,293.33; on January 7, 2005, in the amount of $27,145.33; on February 7, 2005, in the amount of $26,849.33; on March 14 and April 11, 2005, in the amount of $ 26,997.33; and on May 6, 2005, in the amount of $25,813.33.

he contacted defendant Fred Rushton, M.D.[6]

During the relevant time period, Dr. Rushton, a specialist in vascular medicine, was employed by the University of Mississippi Medical Center ("UMMC") School of Medicine as a Clinical Associate Professor of Surgery, and was also an employee of University Surgery Associates, PLLC ("University Surgery").[7]  University Surgery is a faculty practice plan of UMMC.[8]  VAMC is the teaching hospital for UMMC.  UMMC and VAMC are parties to a Memorandum of Affiliation (the "Affiliation Agreement") which authorizes the VAMC to affiliate with UMMC "for the academic purposes of enhanced patient care, education and research."[9]  In a memo dated March 7, 2001, from Dr. A. Wallace Conerly, Vice Chancellor of

---

[6] Dr. Mercer testified that he believed that at the time of this conversation, Dr. Rushton was at Baptist Hospital in Jackson, Mississippi.  Dr. Rushton denies that this conversation took place, but does admit that on the morning in question he was at Baptist Hospital performing surgery on a private patient.  Dr. Rushton avers that he had no knowledge of Mr. Creel until he received a telephone call from the radiologist at St. Dominic's Hospital, a nearby private hospital, who performed the arteriogram on Mr. Creel's leg and who informed Dr. Rushton that he had been given his name as the vascular surgeon covering the VAMC.  At this time, Dr. Rushton was in the middle of a case at Baptist, and he called some residents at VAMC and told them to get Mr. Creel ready for surgery.  Dr. Rushton avers that as soon as the procedure at Baptist was over, he immediately went to the operating room at VAMC and began surgery on Mr. Creel.

[7] Dr. Rushton also performed surgery at various hospitals other than VAMC and UMMC as a private practitioner, and he billed for those services through his private PLLC.

[8] Faculty practice plans provide additional income for UMMC faculty.  *Mozingo v. Scharf*, 828 So. 2d 1246, 1254 (Miss. 2002) (*citing* Miss. Att'y Gen. Op. No. 98-0500, 1998 WL 703775 (Sept. 4, 1998)).  Each department at UMMC, with the exception of the Ophthalmology Department, has established a formal medical practice plan.  *Id.*

[9] The Affiliation Agreement's stated goal is "one standard for patient care, one standard for resident and student education, one standard for research, and one standard for faculty appointments.  The parties to the affiliation agreement also seek to avoid duplication of academic assets and where mutually beneficial to enter into legal agreements to share patient care delivery services, facilities, equipment, and other resources that support the affiliation."  The Affiliation

the VAMC, to Dr. William W. Turner, Chairman of the Department of Surgery at UMMC and Manager of University Surgery, Dr. Conerly stated:

> "...VAMC is an integrated teaching hospital of...[UMMC]..., and as such, plays a key role through its medical and surgical services in advancing the mission of [UMMC]. The Department of Surgery and its Division of General Surgery and Section of Vascular Surgery need to provide faculty support for medical and surgical services at the VAMC to support the teaching, research, and patient care missions of the UMMC. This faculty support will involve the assignment of Dr. Fred Rushton to provide general and vascular surgery services at the VAMC through the department practice plan. University Surgery [ ], as the practice plan of the Department of Surgery, is a vehicle by which the Department of Surgery may contract for the provision of general and vascular surgery services to the VAMC."

Following that memo, University Surgery entered into a contract with VAMC dated May 1, 2001 (the "University Surgery Contract"), which provides that University Surgery "shall evaluate, diagnose, and manage patients with peripheral vascular disease." On November 5, 2002, Dr. Rushton was the on-call vascular surgeon pursuant to the University Surgery Contract.

    Dr. Mercer testified that because no VAMC radiologist was immediately available to perform the arteriogram, he made arrangements for plaintiff to be transferred to St. Dominic's Hospital, a nearby private hospital. Dr. Mercer testified that he called Dr. Rushton to update him on the situation and Dr. Rushton told him to have the radiologist call him after the arteriogram. Dr. Mercer testified that he thought that Dr. Rushton might perform post-arteriogram vascular surgery at St. Dominics, because he had privileges there. However, after the arteriogram, plaintiff was then transferred back to VAMC and underwent multiple procedures there under the

---

Agreement contemplates that corollary agreements may be entered into between the parties involving any component of UMMC or the VAMC to support the affiliation.

care of Dr. Rushton, concluding with the amputation of his left leg above the knee on December 23, 2002.

Plaintiff brought suit against the United States on July 19, 2004 under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* On October 28, 2004, plaintiff filed his First Amended Complaint in which he added Drs. Mercer and Rushton as defendants. On May 13, 2005, the United States moved to dismiss the complaint on the ground of sovereign immunity under the FTCA. Also on May 13, 2005, Dr. Mercer moved to dismiss the complaint claiming immunity under the FTCA as an employee of the United States, and immunity under the Mississippi Tort Claims Act, Miss. Code Ann. § 11-46-1 *et seq.*, as an employee of the State of Mississippi, and requesting that this court certify him as both a federal and state employee. On May 20, 2005, Dr. Rushton moved for summary judgment claiming that he is immune from liability as a state employee under the MTCA. On July 11, 2006, Dr. Mercer filed a second and alternative motion to dismiss, arguing that plaintiff has failed to comply with certain notice and certification requirements under Mississippi law. As these four motions all involve related issues of fact and law, they will be addressed together in this opinion.

## ANALYSIS

### Federal Tort Claims Act

The doctrine of sovereign immunity bars suits against the United States unless there has been an express, clear and unequivocal waiver by the United States of its sovereign immunity. *Block v. N. Dakota, ex rel. Bd. of University & School Lands*, 461 U.S. 273, 287 (1983); *Boehms v. Crowell*, 139 F.3d 452, 462 (5th Cir. 1998). The terms of such consent establish the court's jurisdiction to entertain suit against the United States. *Lehman v. Nakshian*, 453 U.S. 156, 160-

61 (1981); *Linkous v. U.S.*, 142 F.3d 271, 275 (5th Cir. 1998). Moreover, any "limitations and exceptions upon which the government consents to be sued must be strictly observed, and exceptions thereto are not to be implied." *Lehman*, 453 U.S. at 161 (citation omitted). Any uncertainties as to waiver must be resolved in favor of the government. *Boehms*, 139 F.3d at 463.

In the Federal Tort Claims Act ("FTCA"), the United States has waived sovereign immunity "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment ... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Under the Tort Claims Act, an employee of the government "includes...officers or employees of any federal agency...". 28 U.S.C. § 2671. "Federal agency" includes, *inter alia*, "independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." *Id.* Thus, the United States is not liable for the acts of its independent contractors. *Linkous*, 142 F.3d at 275 (*citing U.S. v. Orleans*, 425 U.S. 807, 813-14 (1976); *Broussard v. U.S.*, 989 F.2d 171, 174 (5th Cir. 1993)).

The United States argues that Dr. Mercer was not an employee of the VAMC, but rather was an independent contractor, and therefore it is immune from suit and should be dismissed.[10] Dr. Mercer, however, has requested that this court certify him an employee of the United States

---

[10] It is undisputed that Dr. Rushton was never an employee or agent of the United States.

and dismiss him as a defendant.[11]

Whether one is an employee of the United States is to be determined by federal law. *See Cavazos v. U.S.*, 776 F.2d 1263, 1264 (5th Cir. 1985) (citations omitted). "The critical factor in determining whether an individual is an employee of the government or an independent contractor is the power of the federal government to control the detailed physical performance of the individual." *Linkous*, 142 F.3d at 275 (*citing Orleans*, 425 U.S. at 814; *Broussard*, 989 F.2d at 174; *Logue v. U.S.*, 412 U.S. 521, 527 (1973)). However, control is not necessarily the only factor - if it were, "no professional who exercises professional judgment could be considered a federal employee under the FTCA." *Id.* (*citing Broussard*, 989 F.2d at 175). Thus, if the government lacks the power to directly control an individual, then the court must look at other factors before deciding the individual's status as an employee or independent contractor. *Id.* at 276 (*citing Rodriguez v. Sarabyn*, 129 F.3d 760, 765 (5th Cir. 1997)). These factors, set forth in section 220 of the RESTATEMENT (SECOND) OF AGENCY, are the following:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the

---

[11] 28 U.S.C. § 2679(b) provides that the remedy of section 1346(b) is exclusive and that any action against the individual employee whose negligence gave rise to the cause of action is precluded. 28 U.S.C. § 2679(d)(3) provides that where the Attorney General has refused to certify that an employee was acting within the scope of his employment, the employee may petition the court to so certify and upon such certification, the United States shall be substituted as the party defendant.

place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is part of the regular business of the employer;

(I) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

RESTATEMENT (SECOND) OF AGENCY § 220 (1958) (*cited in Linkous*, 142 F.3d at 276 (*citing Rodriguez*, 129 F.3d at 765)).[12]

The Fifth Circuit's decision in *Linkous* is highly instructive. In *Linkous*, defendant, Dr. Sims, contracted with Darnell Army Community Hospital ("DACH"), a military facility, to provide obstetrics/gynecological services to beneficiaries of a statutory health benefits program for dependants of military service members.[13] 142 F.3d at 274. Dr. Sims and DACH memorialized their partnership agreement in a Memorandum of Understanding. *Id.* The plaintiff sought and received gynecological services from Dr. Sims and subsequently filed suit against Dr.

---

[12] In *Rodriguez*, the court referenced the explanatory comments to these factors, which list the following factors as evidence of the existence of an employee relationship: (1) the work does not require one who is highly educated or skilled; (2) the work is typically done by an employee in the locale, rather than an independent contractor; (3) the employer supplies the tools, instrumentalities, or place of work; (4) the employment is for a considerable period of time with regular hours; (50 the method of payment is by the hour or month; (6) the work is full-time employment by one employer; (7) the work is part of the employer's regular business; and (8) the parties believe they have created an employment relationship. *Rodriguez*, 129 F.3d at 765 (*citing* RESTATEMENT (SECOND) OF AGENCY § 222(2) & cmt. (h)).

[13] Federal law authorizes the Secretary of Defense to enter into partnership agreements with private health care providers to provide services at military facilities. *Linkous*, 142 F.3d at 274.

Sims and the United States, alleging that such services were performed negligently. *Id.* at 274-75. As in the case at bar, the United States moved for dismissal, arguing that Dr. Sims was not an employee of the government. *Id.*

The *Linkous* court methodically examined the Restatement factors in analyzing whether Dr. Sims was an employee or an independent contractor. The court first looked to the extent of control, finding that it weighed heavily in favor of independent contractor status. *Id.* at 276. Although the MOU provided that Dr. Sims was required to adhere to all hospital bylaws and Army regulations to the same extent as Army health care providers, Dr. Sims was not subject to other supervisory controls imposed on military health care personnel, such as being required by the Chief of the Department of Obstetrics and Gynecology to attend morning meetings or having routine performance evaluations conducted. *Id.* Moreover, although DACH exercised some control over administrative aspects of Dr. Sims' practice, it exercised no control over the day-to-day rendition of medical service or override her medical judgment regarding diagnosis and treatment. *Id.* at 276. *See also Lurch*, 719 F.2d at 337 (holding that requisite control was lacking where neurosurgeon's decision to operate and selection of surgical procedures and instruments were made without the control or influence of the VA hospital).

In this case, Dr. Mercer was a full-time member of the orthopaedic staff at the VAMC. The Mercer Contract provides that Dr. Mercer's services are to be performed in accordance with VA policies and procedures, including the by-laws and the VA handbook, and are to be performed "under the direction of the Chief of Staff and Chief, Surgical Service." These indicate control on the part of the VA. However, Dr. Mercer testified that it was solely his decision, in the exercise of his professional judgment, as to which procedure to perform on plaintiff. Prior to

performing the procedure on plaintiff, Dr. Mercer did not discuss it with the Chief of Surgery, nor did the Chief come into the surgery suit while Dr. Mercer was operating on plaintiff. This is in line with the provision in the Mercer Contract that states: "The Government may evaluate the quality of professional and administrative services provided but retains no control over professional aspects of the services rendered, including, by example, the Contractor's or its health care providers' professional medical judgment, diagnosis, or specific medical treatments." Following his treatment of plaintiff, however, Dr. Mercer did discuss the surgery with the Chief of Surgery because it was his "administrative responsibility" to remain informed. At any rate, this is not the determinative issue because, as noted above, if it were, "no professional who is required by a code of ethics to exercise professional judgment could ever be considered an employee of the United States for FTCA purposes." *Broussard*, 989 F.2d at 175.

The Mercer Contract also mandates that Dr. Mercer be present Monday through Friday 8:00a.m. to 4:30p.m. This is in contrast to *Linkous*, where Dr. Sims' "supervisor," the Chief of the Department of Obstetrics and Gynecology, had no authority to assign Dr. Sims a schedule or to require her to attend morning meetings. 142 F.3d at 274. In addition, Dr. Mercer did not maintain a clinic or practice outside of the VAMC, although the Mercer Contract did not expressly prohibit him from doing so.[14] In addition, Dr. Mercer was required to supervise UMMC residents, as set forth in the Mercer Contract. Indeed, Dr. Mercer supervised residents during his pre and post operative treatment of plaintiff, as well as during the surgery itself.

Based on these facts, the court concludes that although it is a very close call, the factor of

---

[14] Although not expressly prohibited from establishing a separate practice, it is hard to imagine how Dr. Mercer could possibly have done so, since his contract required that he be at the VAMC from 8:00 to 4:30, five days a week.

control favors an employee status for Dr. Mercer. The court will now look at the remaining factors.

The *Linkous* court found that factors (b) and (d) weighed in favor of independent contractor status, because as an ob/gyn with DACH, Dr. Sims was "engaged in a distinct occupation...of the type usually done by a specialist without supervision," and it "required a high degree of skill." *Id.* at 277. Similarly, here, this factor weighs in favor of independent contractor status as Dr. Mercer is an orthopedic surgeon. The *Linkous* court then found that factor (g) also indicated independent contractor status because Dr. Sims was paid on a fee-for-service basis, rather than an annual salary like military doctors. *Id.* at 274. Here, Dr. Mercer submitted monthly invoices to the government in varying amounts. The Government contends that these amounts varied depending on the numbers of hours Dr. Mercer worked each month. Dr. Mercer contends he was merely being paid increments of his yearly salary. Neither party contends that Dr. Mercer was paid on a fee-for-service basis. The court finds that although it is somewhat ambiguous, this factor favors employee status.

The *Linkous* court then found that factor (i) supported independent contractor status because the record showed that the parties did not believe they were creating an employer-employee relationship. *Id.* at 277. The MOU described Dr. Sims as a "participating health care provider" rather than an employee and it acknowledged the government's liability for the acts of its "employees," but indicated that DACH was not liable of the acts of "participating health care providers." *Id.* In addition, as a prerequisite for receiving CHAMPUS[15] fee-for-service

---

[15] CHAMPUS stands for the Civilian Health and Medical Plan of the Uniformed Services.

13

payments, Dr. Sims certified that she was not an employee of the United States on the CHAMPUS application. *Id.* Moreover, the MOU required Dr. Sims to provide full professional liability insurance for her and her support personnel, and required her to obtain insurance for the purpose of indemnifying the United States for any liability resulting from her exercise of clinical privileges at DACH: "If Dr. Sims believed she was becoming an employee of DACH, then there would have been no need for her to indemnify the government for her negligence." *Id.* at 277. *See also Lurch v. U.S.*, 719 F.2d 333, 338 (10th Cir. 1983) (finding no employer-employee relationship between a neurologist and a VA hospital because, *inter alia*, the contract expressly stipulated "[s]uch [medical] personnel shall not be considered VA employees for any purpose" and the VA had no responsibility for providing workmen's compensation, insurance, health examinations or social security payments under the contract).

In this case, the Mercer Contract provides that "[t]he contractor shall be responsible for protecting the personnel furnishing services under this contract"[16] and requires Dr. Mercer to provide for his personnel's workers' compensation, one million dollars of professional liability insurance, health examinations, income tax withholding and social security payments. The United States paid Dr. Mercer's invoices in full, with no deductions for any withholdings to which federal employees are normally subject, such as federal taxes, state taxes, Medicare or Medicaid, federal withholding or any other withholding. Moreover, the Mercer Contract expressly provides that "the parties agree that the contractor, its employees, agents and subcontractors shall not be considered VA employees for any purpose." The Mercer Contract also provides that "[i]t is expressly agreed and understood that this is a nonpersonal services

---

[16] Dr. Mercer did not hire any of his own personnel.

contract...under which the professional services rendered by the Contractor or its health care providers are rendered in its capacity as an independent contractor" and that "[t]he contractor and its health care providers shall be liable for their liability-producing acts or omissions." Dr. Mercer testified at his deposition that during the contract negotiations, there were discussions about the difference between employees and independent contractors, and that he understood he was to be an independent contractor. He testified that he considered being an employee of the VAMC at the time he was negotiating the contract, but decided to be an independent contractor instead because he would make more money.[17] Dr. Mercer testified that he knew that he would not have to have professional liability insurance if he were an employee. In addition, although Dr. Mercer does not maintain a private practice nor see patients outside of the VAMC, the Mercer Contract does not expressly prohibit him from doing so. *See Linkous*, 142 F.3d at 274 (noting that while Dr. Sims had no admitting privileges at any other hospital and did not maintain a private office or see patients outside of her DACH practice, the MOU did not prohibit her from doing so).[18] For all of these reasons, the court finds that, as in *Linkous*, this factor militates against a finding of an employer-employee relationship.

The *Linkous* court then found that the remaining factors supported the conclusion that Dr. Sims was an employee of DACH. First, DACH provided the "instrumentalities, tools, and the place of work" for Dr. Sims. *Id.* at 277 (citing factor (e)). Although Dr. Sims hired her own

---

[17] However, Dr. Mercer also testified that during the 1970's he worked at Keno Hospital pursuant to a contract that labeled him an "independent contractor" but that the IRS "very clearly said that [the contract] was not legal and didn't stand up" and therefore deemed him to be an employee.

[18] As noted earlier, it is hard to imagine how, as a practical matter, Dr. Mercer could possibly have maintained a private practice.

nurse to assist her with patients, she used DACH personnel to schedule her appointments, accepted all referrals from DACH practitioners and only referred her patients to other DACH practitioners. *Id.*  Here, the VAMC provided the instrumentalities, tools and place of work for Dr. Mercer, and Dr. Mercer did not maintain an office or clinic outside his practice at the VAMC (although not prohibited by the Contract).  In addition, the Mercer Contract provides that "[o]ther necessary personnel for the operation of the services contracted for at the VA will be provided by the VA at levels mutually agreed upon which are compatible with the safety of the patient and personnel and with quality medical care programming."  Dr. Mercer testified that he did not engage any personal employees of his own and utilized only the staff supplied by the VAMC.  Thus, this factor favors an employee status for Dr. Mercer.

Dr. Sims also worked at DACH for a period of "several years" (although the court did not indicate for exactly how long Dr. Sims worked there). *Id.* (citing factor (f)).  In the case at bar, Dr. Mercer worked at the VA only for a few months at the time of plaintiff's surgery.  However, at the time this lawsuit was filed, Dr. Mercer had worked at the VAMC for almost two years, and at the time of the filing of Dr. Mercer's motion to dismiss, Dr. Mercer had worked at the VAMC for three years.  The court finds that this factor is neutral.

The *Linkous* court also noted that DACH "is in the business of providing a wide range of medical services, including the ob/gyn services provided by Dr. Sims." *Id.* (citing factors (h) and (j)).  Similarly, here the VAMC is in the business of providing a wide range of medical services, including the orthopedic surgery services provided by Dr. Mercer.  This factor favors an employee status.

Based on its above analysis of the relevant factors, this court finds that during the relevant

time period, Dr. Mercer was an employee of the federal government and so certifies him pursuant to 28 U.S.C. § 2679(d)(3). In addition, Dr. Mercer's motion to dismiss shall be granted, as plaintiff's exclusive remedy is against the federal government, pursuant to 28 U.S.C. 2679(b).[19] The court will now turn to Dr. Rushton's motion for summary judgment.

### Mississippi Tort Claims Act

Dr. Rushton argues that he is a state employee and therefore is immune from suit under the MTCA. Section 11-46-7 of the Mississippi Code Annotated provides that "no employee [of a governmental entity] shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties." "Governmental entity" is defined to include the state and its political subdivisions, including hospitals and universities. Miss. Code Ann. § 11-46-1(g), (j). UMMC's status as the "state" for purposes of the MTCA is well-established. *See*, *e.g.*, *Davis v. Hoss*, 869 So. 2d 397, 401 (Miss. 2004). Moreover, the Mississippi Supreme Court has held that UMMC's departmental practice plans, such as University Surgery, are governmental entities within the meaning of the MTCA. *Mozingo v. Scharf*, 828 So. 2d 1246, 1254-55 (Miss. 2002); *Watts v. Tsang*, 828 So. 2d 785, 794 (Miss. 2002). "Employee" is defined by the MTCA as "any officer, employee or servant of the State of Mississippi..." and includes "any physician...or other health care practitioner employed by the...UMMC and its departmental practice plans who is a faculty member and provides health care services only for patients at UMMC or its affiliated practice sites." Miss. Code Ann. § 11-46-1(f). Like the FTCA, the MTCA explicitly excludes independent contractors from its provisions. Miss. Code Ann. § 11-

---

[19] Accordingly, the court need not - and thereby declines - to address whether Dr. Mercer has immunity under state law. In addition, because of the disposition of Dr. Mercer's motion to dismiss, the court overrules as moot Dr. Mercer's second and alternative motion to dismiss.

46-1-(f).

Plaintiff has conceded that both UMMC and University Surgery are state entities subject to the MTCA, and he has also conceded that Dr. Rushton was a state employee on November 5, 2002, the day of plaintiff's surgery. Indeed, Dr. Rushton was the on-call vascular surgeon available for VAMC patients on that day, pursuant to the University Surgery Contract between University Surgery and UMMC as well as the Affiliation Agreement between UMMC and VAMC. Plaintiff argues, however, that there is a genuine issue of material fact as to whether Dr. Rushton's involvement in plaintiff's care took place within the course and scope of his duties as a state employee.

Plaintiff's argument is based on the following facts. Plaintiff's allegation of negligence with respect to Dr. Rushton centers on Dr. Rushton's decision to defer emergency surgery for plaintiff on the morning of November 5, 2002 and instead to send plaintiff to St. Dominic's hospital, a private hospital, for radiological study. Dr. Mercer has testified that the decision to delay Mr. Creel's surgery was made by him in consultation with Dr. Rushton, during a phone conversation on November 5 (which Dr. Rushton denies). At the time when Dr. Mercer claims to have consulted with Dr. Rushton, Dr. Rushton was engaged in surgery at Baptist Hospital, not at UMMC, as part of his private practice.[20] In addition, Dr. Mercer has testified that he assumed that Dr. Rushton might want to perform surgery on Mr. Creel at St. Dominic's (a private hospital) after the arteriogram was concluded. Based on these facts, plaintiff argues that Dr.

---

[20] During the relevant time period, Dr. Rushton also held privileges to perform surgery at several hospitals outside the UMMC and VAMC systems, and up to 40% of his surgeries were performed at those facilities. Dr. Rushton did not bill for these services through UMMC or University Surgery but through a separate billing organization. None of these fees were shared with UMMC or University Surgery.

Rushton's employment status at the time he was purportedly contacted by Dr. Mercer was that of an independent contractor engaged in the private practice of surgery. The court disagrees.

For the purposes of the MTCA, a rebuttable presumption exists that "any act or omission of an employee within the time and at the place of his employment is within the course and scope of his employment." Miss. Code Ann. §§ 11-46-5-3 & -7(7); *see also Davis v. Hoss*, 869 So. 2d 397, 403 (Miss. 2004). "Course of employment" is defined as "[e]vents that occur or circumstances that exist as part of one's employment; esp., the time during which an employee further's an employer's goals through employer-mandated directives." *Meeks v. Miller*, — So. 2d ____, 2007 WL 1501083, at * 2 (Miss. May 24, 2007) (*citing* BLACK'S LAW DICTIONARY 356 (7th ed. 1999)). "Scope of employment" is defined as "[t]he range of reasonable and foreseeable activities that an employee engages in while carrying out the employer's business." *Id.* (*citing* BLACK'S LAW DICTIONARY 1348 (7th ed. 1999)).

It is undisputed that at the time of Dr. Rushton's treatment of plaintiff, he was an employee of the state. At the time of Dr. Mercer's purported phone call to Dr. Rushton, Dr. Rushton was the on-call vascular surgeon for the VAMC, pursuant to this employment with University Surgery and UMMC, through the University Surgery Contract with VAMC and the Affiliation Agreement between UMMC and VAMC. Dr. Rushton's only involvement with plaintiff, a VAMC patient, was by virtue of those relationships. All of the care provided to plaintiff by Dr. Rushton occurred at the VAMC pursuant to these arrangements. Moreover, any charges for services rendered by Dr. Rushton to plaintiff were paid to University Surgery pursuant to the University Surgery Contract and the Affiliation Agreement. The court agrees with Dr. Rushton that his location at the time he received the alleged phone call from Dr. Mercer

is irrelevant to the question of whether or not he was acting within the scope of his state employment with respect to Mr. Creel's medical care. In addition, a careful reading of Dr. Mercer's deposition testimony shows that he merely *thought* that Dr. Rushton might perform post-arteriogram vascular surgery at St. Dominics, because he had privileges there. Dr. Mercer did not testify that Dr. Rushton actually told him that he was planning to perform surgery at St. Dominic's. Dr. Mercer's subjective belief as to where Dr. Rushton was planning to perform the surgery is irrelevant. Accordingly, the court finds that there is no genuine issue of material fact as to Dr. Rushton's status as a state employee at the time of the events in question, nor is there a genuine issue of material fact that the alleged negligence occurred within the course and scope of Dr. Rushton's duties as a state employee. Accordingly, summary judgment for Dr. Rushton is warranted.

IT IS, THEREFORE, ORDERED AND ADJUDGED that Dr. Mercer is certified as an employee of the United States, that defendant United States' motion to dismiss [**# 25**] is denied, that defendant Mercer's motion to dismiss [**# 23**] is granted, that Defendant Rushton's motion for summary judgment [**# 30**] is granted and that Defendant Mercer's second and alternative motion to dismiss [**# 62**] is overruled as moot.

SO ORDERED and ADJUDGED on this, the 30th day of May, 2007.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE